UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES WILLEY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WEXFORD OF INDIANA, LLC, et al. )<br>)<br>Defendants. ) | No. 1:19-cv-00953-SEB-MPB |

**Order Granting Motion for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff James Willey, an inmate at the Pendleton Correctional Facility ("PCF"), brought this action pursuant to 42 U.S.C. § 1983 alleging that defendants Michelle LaFlower, Paul Talbot, and Michael Mitcheff exhibited deliberate indifference to his need for treatment for his back pain. Mr. Willey also alleges that these failures were the result of a policy by Wexford of Indiana, LLC of cutting costs. The defendants have moved for summary judgment on Mr. Willey's claim. Mr. Willey has not responded, and the time to do so has passed. For the following reasons, the motion for summary judgment is **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the

suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).

Mr. Willey failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See* S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). This does not alter the summary judgment standard, but it does "[r]educe[] the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

## II. Facts

A. *The Parties*

Mr. Willey is a 76-year-old man who has been incarcerated by the Indiana Department of Correction ("IDOC") since 1997. *See* dkt. 41-4, p. 8-9. Mr. Willey has suffered from back pain for many years. Dkt. 41-1 ¶ 8. He has received a number of treatments from an off-site neurosurgeon, including epidural injections and a rhizotomy.[1] *Id.*

Paul A. Talbot, M.D. is a physician licensed to practice medicine in the State of Indiana. Dkt. 41-2, ¶ 1. During all times relevant to Mr. Willey's Complaint, he was employed by Wexford of Indiana, LLC as a physician at PCF. *Id.* Currently, Dr. Talbot still works for Wexford of Indiana, LLC, at the Reception and Diagnostic Center in Plainfield, Indiana. *Id.*, ¶ 1-2.

Michael A. Mitcheff, D.O. is a physician licensed to practice in the State of Indiana. Dkt. 41-1, ¶ 1. Since July 2018, Dr. Mitcheff been employed by Wexford of Indiana, LLC as the Regional Medical Director for the State of Indiana. *Id.*, ¶ 2. As the Regional Medical Director, Dr. Mitcheff rarely has direct patient contact, although he can in certain circumstances where it is necessary. *Id.* ¶ 3. Instead, Dr. Mitcheff oversees the provision of medical care by practitioners at the site level, reviews requests for non-formulary prescriptions, discusses with on-site staff requests for patients to receive off-site medical care, and performs other oversight functions as are necessary. *Id.*, ¶ 3. Mr. Willey testified that he is suing Dr. Mitcheff because Dr. Mitcheff is Dr. Talbot's boss and he was informed that Dr. Mitcheff would be contacted about his back pain. Dkt. 41-4, p. 23-24. Mr. Willey also testified that he wrote letters to Dr. Mitcheff, but Dr. Mitcheff never responded. *Id.*

---

[1] A rhizotomy "is a surgical procedure to sever nerve roots in the spinal cord" intended to relieve chronic back pain and muscle spasms. Dkt. 41-2, ¶ 5.

3

During Dr. Mitcheff's time as the Regional Medical Director, he had discussions with Dr. Talbot and other medical staff regarding Mr. Willey's treatment. Dkt. 41-1, ¶ 5. These discussions focused on Mr. Willey's eyesight, cataracts, and referral for off-site vision care. *Id.* Dr. Mitcheff specifically recalls a conversation with Dr. Talbot on September 6, 2018, in which he received a recommendation for Mr. Willey to receive off-site care for ongoing cataract and blurry vision, which Dr. Mitcheff approved. *Id.*

Michelle LaFlower is a nurse licensed to practice in the State of Indiana. Dkt. 41-3, ¶ 1. During all times relevant to Mr. Willey's Complaint, she was employed by Wexford of Indiana, LLC as the Health Services Administrator at PCF. *Id.* ¶ 2. As the Health Services Administrator, her duties and responsibilities were primarily administrative in nature. *Id.*, ¶ 3. She was responsible for oversight of medical care at the facility, ensuring compliance with healthcare directives, responding to requests for information, coordinating information with the IDOC, and responding to informal requests and grievances at the facility that were medical in nature. *Id.* As a nurse, Ms. LaFlower did not have the authority to order specific medical treatment or diagnose a patient. *Id.*, ¶ 4. Therefore, she did not have the authority to order back surgery, or order that he be sent off-site for a surgical consult. *Id.*

B. *Mr. Willey's Medical Treatment*

1. Treatment in 2017

On May 6, 2017, Mr. Willey had a Chronic Care visit with Dr. Talbot. Dkt. 41-2, ¶ 7; Dkt. 41-5, p. 449–53. Dr. Talbot noted Mr. Willey's history of hypertension, asthma, and gastroesophageal reflux disease ("GERD") and continuing his medications including artificial tears, Capsaicin topical cream, low dose aspirin, HCTZ, Ibuprofen, Lisinopril, Ranitidine, eye ointment, Tylenol, Zocor, and a Xopenex inhaler. *Id.*

4

Dr. Talbot next saw Mr. Willey on July 25, 2017, to discuss his history of asthma and hypertension, but also to discuss some recent Healthcare Requests Mr. Willey had submitted complaining of recurring back pain. Dkt. 41-2, ¶ 8; dkt. 41-5, p. 63-67. Dr. Talbot noted that Mr. Willey had reported initially that the rhizotomy worked, and at that time was complaining of return of back pain but was refusing another off-site appointment. *Id.* After a discussion of potential options, Dr. Talbot recommended that Mr. Willey begin on-site physical therapy, and he agreed. *Id.* Dr. Talbot ordered blood tests, and continued his pain medication, which included Capsaicin cream and Ibuprofen. *Id.*

Dr. Talbot saw Mr. Willey again on October 16, 2017. Dkt. 41-2, ¶ 9, Dkt. 41-5, p. 59-62. They discussed Mr. Willey's chronic conditions, including his back pain. *Id.* Dr. Talbot dispensed to him Capsaicin cream and Mobic, as he reported benefit. *Id.*

2. Treatment in 2018

Dr. Talbot next saw Mr. Willey on March 1, 2018.[2] Dkt. 41-2, ¶ 11; dkt. 41-5, p. 49-52. They had a long discussion regarding Mr. Willey's back pain in which Mr. Willey reported the symptoms began approximately 26 years ago and lasted ever since. *Id.* Mr. Willey complained primarily of low back and right hip pain with numbness and tingling. *Id.* He reported he was using a cane to walk short distances and a wheelchair for long distances. *Id.* He also stated that he had recently been receiving Mobic and Capsaicin which provided some relief and requested a refill. *Id.* Dr. Talbot also performed another review of the medical history, including some relevant dates, specifically the results of prior X-rays, as well as an MRI that was completed in May 2014. *Id.* Dr. Talbot noted that Mr. Willey saw a neurosurgeon in July 2014 who felt that surgical

---

[2] While this medical record notes that this visit was completed by Nurse Practitioner Murage, based upon the language and the sentence structure, Dr. Talbot concludes that he authored this record. Dkt. 41-2, ¶ 11.

intervention was not indicated and ordered the alternative plan of injections and the rhizotomy. *Id.* Dr. Talbot also noted that Mr. Willey was previously receiving Neurontin, but the medication was discontinued after lab tests showed a low level, consistent with non-compliance. *Id.* Dr. Talbot's assessment was spondylosis of the lumbar region with degeneration. *Id.* Dr. Talbot ordered additional X-rays and made sure he had continued orders for pain medication, specifically Capsaicin cream and Mobic, which he reported provided some relief. *Id.*

Dr. Talbot followed up with Mr. Willey on March 30, 2018, in which they discussed the X-ray report. Dkt. 41-2 ¶ 12; dkt. 41-5, p. 45-47. This prior X-ray had noted degeneration of the lumbar spine. An order for physical therapy was entered, as well as continuations of the orders for pain medication, specifically Capsaicin and Mobic. *Id.*

Mr. Willey had physical therapy on April 10, 2018, and April 19, 2018. Dkt. 41-2, ¶¶ 13, 14; dkt. 41-5, p. 41, 42-43. On May 8, 2018, Mr. Willey had another visit with the physical therapist, but reported increased pain, and the physical therapist indicated she would not schedule further sessions. Dkt. 41-2, ¶ 15; dkt. 41-5, p. 39-40.

Dr. Talbot next saw Mr. Willey on May 31, 2018, for a follow up, in which he reported that his back pain was exacerbated by physical therapy. Dkt. 41-2, ¶ 16, dkt. 41-5, p. 35-38. They discussed some pain management alternatives, and Mr. Willey specifically indicated that he did not want Neurontin, as it did not help him before. *Id.* He reported his pain was triggered by laying on his side and that Mobic provided relief. *Id.* Dr. Talbot noted the findings of the prior X-ray with osteoarthritis of both hips. *Id.* The assessment was chronic degenerative joint disease of the thoracic spine, lumbar spine, pelvis and hips. *Id.* Dr. Talbot ordered a wedge pillow to assist him with sleep, renewed his prescription for Mobic and ordered another X-ray of the lumbar spine

given his report that his condition may have been exacerbated by physical therapy. *Id.* On June 6, 2018, Mr. Willey was a no show for his X-ray. Dkt. 41-2, ¶ 17, dkt. 41-5, p. 34.

On June 18, 2018, Dr. Talbot had another visit with Mr. Willey after he submitted a Healthcare Request for allergies and back pain. Dkt. 41-2, ¶ 18; dkt. 41-5, p. 30-33. Dr. Talbot noted that he had received an X-ray of the lumbar spine on June 12, 2018, but the report was unchanged from prior X-rays in March 2018 and from 2013. *Id.* Dr. Talbot reviewed these results with Mr. Willey. *Id.* Dr. Talbot noted that while he had pain, he had no functional limitations and was able to perform his activities of daily living. *Id.* Dr. Talbot advised him to continue his home exercise plan as he could tolerate, and that treatment would focus upon his ability to function. *Id.* Dr. Talbot also continued a prescription for Mobic, as Mr. Willey indicated it was beneficial. *Id.*

Dr. Talbot's next visit with Mr. Willey was on August 20, 2018, after he submitted a written sick call request stating he wanted surgery for his back. Dkt. 41-2, ¶ 20; dkt. 41-5, p. 23-25. Dr. Talbot noted no functional limitations and that he still had the ability to perform his normal activities. *Id.* Dr. Talbot renewed Mobic and counseled him to continue his home exercise plan, but at this time did not see any indication for a surgical evaluation. *Id.* It is Dr. Talbot's understanding from the pleadings that Mr. Willey alleges that on August 20, 2018, Dr. Talbot informed him that he would be referring him to see an off-site surgeon or referring him for an evaluation from Dr. Mitcheff. Dkt. 41-2, ¶ 21. Dr. Talbot does not recall making any such statements. *Id.* Instead, it is possible that Dr. Talbot stated to him that if his condition progresses or gets worse from a functional standpoint, those were available treatment options in the future. *Id.* However, on August 20, 2018, Dr. Talbot did not believe that Mr. Willey required a surgical consult or an evaluation from Dr. Mitcheff. *Id.*, ¶ 21.

On or around September 9, 2018, Mr. Willey completed an IDOC request for interview form, stating that he had been seen during sick call in August of 2018 and was told that he would be referred to see Dr. Mitcheff for having back surgery, and requesting an update regarding the status of these requests. Dkt. 41-3, ¶ 5; dkt. 41-6. After she received this request, Ms. LaFlower reviewed Mr. Willey's recent medical records. Dkt. 41-3, ¶ 6. Ms. LaFlower noted that Dr. Talbot evaluated Mr. Willey on August 20, 2018. However, during that visit, Dr. Talbot noted "no indication for surgical evaluation at this time." *Id.* There was also no indication that Mr. Willey was going to be referred to Dr. Mitcheff or off-site surgery. *Id.* Ms. LaFlower also looked for signs of an OPR (Off-site Patient Request), which is used when a practitioner believes that a patient should receive medical care off-site. *Id.* ¶ 7. Ms. LaFlower did not see that an OPR had been submitted. *Id.* Ms. LaFlower therefore drafted a brief response stating that Mr. Willey saw the provider on August 8, 2018, his pain was controlled by Mobic and to continue his exercises, with no indication for a surgical evaluation nor any mention of a reference for Mr. Willey to be evaluated by Dr. Mitcheff. *Id.*, ¶ 8; dkt. 41-6. To Ms. LaFlower's knowledge, this is her only involvement in Mr. Willey's care and treatment during the relevant timeframe. Dkt. 41-3, ¶ 9.

On September 27, 2018, Dr. Talbot had Mr. Willey brought in after submitting a Healthcare Request slip. *Id.*, ¶ 23; dkt. 41-5, p. 16-19. But when Mr. Willey arrived, he indicated he did not put in a sick call request, that someone must have filled one out in his name, and that Internal Affairs was going to look into it. *Id.*

On December 5, 2018, Dr. Talbot saw Mr. Willey again for renewal of his pain medication and permits. Dkt. 41-2, ¶ 24; dkt. 41-5, p. 12-15. Mr. Willey informed Dr. Talbot that he wanted back surgery. *Id.* Dr. Talbot noted that during an assessment, he did not have any functional limitations, as he could sit and stand easily, put on and take off his shoes and socks as was

8

demonstrated in the clinic. *Id.* However, he did report that he still would like a wheelchair for long distances. *Id.* Dr. Talbot was worried about medication non-compliance for hypertension as he has been refusing all statins. *Id.* Dr. Talbot ordered that he continue receiving Mobic as well as Zyrtec for allergies, monitor blood pressure once a week for six weeks, and he renewed his permits for a bottom bunk, bottom range, and a wheelchair. *Id.*

### 3. Treatment in 2019

On January 4, 2019, Mr. Willey had another Chronic Care visit with Dr. Talbot where they discussed hypertension, GERD, and his complaints of back pain. Dkt. 41-2, ¶ 25; dkt. 41-5, p. 7-11. Mr. Willey had no new complaints, but requested that his medications and meals be delivered. *Id.* Considering his ongoing complaints of pain, Dr. Talbot decided to add an additional pain medication, Pamelor 10 mg, in addition to the prescription for Mobic. *Id.* Pamelor is an anti-depressant medication, but it is also approved for the treatment of chronic pain. *Id.* It was Dr. Talbot's hope that adding Pamelor in conjunction with Mobic would provide some additional pain relief. *Id.* Reluctantly, Dr. Talbot also agreed to order that he be "medically idle", meaning his medications and meals would be delivered to his cell front. *Id.* Dr. Talbot was reluctant because he was concerned that less movement may lead to further deconditioning, and an increased impact that his discomfort may have on his activities of daily living. *Id.*

On or about May 3, 2019, Mr. Willey was transferred from PCF, to the Correctional Industrial Facility ("CIC"), which is also in Pendleton. Dkt. 41-2, ¶ 26; dkt. 41-5, p. 6.

After his transfer to CIC, Mr. Willey was seen by another doctor, who ordered that his pain medication going forward be an increased dosage of aspirin. Dkt. 41-2, ¶ 27; dk. 41-5, p. 1-3. Eventually, Mr. Willey was transferred to the New Castle Correctional Facility, and initially, Dr. John Nwannunu ordered Mobic 7.5 mg, which was the same that Dr. Talbot had ordered for

9

him initially at PCF. *Id*. On November 12, 2019, Mr. Willey was assessed during a chronic clinic appointment with Dr. Erik Falconer, who continued the prescription of Mobic. Dkt. 41-2, ¶ 28; dkt. 41-5, p. 74-77.

Since he has stopped seeing Dr. Talbot and has been transferred to a new facility and seen new physicians, Mr. Willey has not been referred for an MRI or referred to a back specialist. Dkt. 41-1, p. 34.

### III. Discussion

The defendants seek summary judgment arguing that they were not deliberately indifferent to Mr. Willey's back pain.

At all times relevant to Mr. Willey's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, Mr. Willey must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Estate of Miller, ex rel. Bertram v. Tobiaz*, 680 F.3d 984, 989 (7th Cir. 2012).

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

For purposes of summary judgment, the defendants do not dispute that Mr. Willey's back pain constitutes a serious medical condition. Instead, the individual defendants argue that they

11

were not deliberately indifferent to his pain. In addition, Wexford argues that there is no evidence that any alleged injury to Mr. Willey resulted from a Wexford policy or practice. Mr. Willey's claims against each defendant will be discussed in turn.

    A. *Dr. Mitcheff*

Dr. Mitcheff seeks summary judgment, arguing that he was not involved in the care that Mr. Willey received for his back pain.

Throughout 2018 and 2019, Dr. Mitcheff was consulted regarding Mr. Willey's vision, and approved Mr. Willey for referrals to see off-site ophthalmology and for operations on his eyes. Dkt. 41-1, ¶ 5. While Mr. Willey testified at his deposition that he believed Dr. Mitcheff would be consulted regarding his back pain and that he wrote letters to Dr. Mitcheff, Dr. Mitcheff does not remember receiving any letter from Mr. Willey, or any correspondence asking that he get involved in Mr. Willey's care. Dkt. 41-1, ¶ 3. Because there is no evidence that Dr. Mitcheff was aware of Mr. Willey's back condition, there is no evidence that he knew about any risk to him and disregarded it. *See Estate of Miller*, 680 F.3d at 989. Dr. Mitcheff is therefore entitled to summary judgment on Mr. Willey's claims.

    B. *Ms. LaFlower*

Ms. LaFlower also argues that she is entitled to summary judgment on Mr. Willey's claims because she was not involved in his care.

Ms. LaFlower responded to a request for interview form in which Mr. Willey stated that he had been told he would be referred to Dr. Mitcheff for potential back surgery. Dkt. 41-3, ¶ 5. Ms. LaFlower reviewed the relevant medical records, noting that Mr. Willey had been seen by Dr. Talbot on August 20, 2018, but that there was no indication for surgical intervention noted at that time, nor had any OPR been submitted for an off-site surgical consult. *Id.* ¶ 6-7. Ms. LaFlower responded that Mr. Willey had been seen by the provider and was prescribed Mobic, but there was no indication from

the record for a surgical evaluation nor any mention of an evaluation by Dr. Mitcheff. *Id.* ¶ 8. Moreover, Ms. LaFlower is a nurse and did not have the authority to order specific medical treatment or diagnose a patient. *Id.*, ¶ 6. In other words, Ms. LaFlower considered Mr. Willey's complaints, reviewed his medical records and concluded that the doctors had not found that Mr. Willey should be referred for surgery. Based these facts, there is no evidence that Ms. LaFlower was deliberately indifferent to any risk to Mr. Willey. Ms. LaFlower is therefore entitled to summary judgment on Mr. Willey's claims.

### C. *Dr. Talbot*

Dr. Talbot argues that he is entitled to summary judgment because he provided appropriate care and treatment to Mr. Willey.

Dr. Talbot saw Mr. Willey several times regarding his complaints of back pain. He prescribed pain medications, referred him for physical therapy, ordered x-rays, and provided him with a low bunk permit and a low range permit, among other things. Dkt. 41-2 ¶ 7, 8, 11. Dr. Talbot examined Mr. Willey based on his complaints, considered his x-rays, and found no reason for surgical intervention. *Id.*, ¶ 20. After Mr. Willey was transferred out of PCF, no other treating physician has referred him to see a specialist or otherwise significantly altered his treatment. *Id.*, ¶ 27-28. There is no evidence that Dr. Talbot disregarded any risk to Mr. Willey or failed to exercise medical judgment. *See Norfleet*, 439 F.3d at 396; *Plummer*, 609 F.App'x 861. Accordingly, Dr. Talbot is entitled to summary judgment on Mr. Willey's claims.

### D. *Wexford*

Finally, Wexford seeks summary judgment on Mr. Willey's claims. Wexford "cannot be held liable for damages because there is no underlying constitutional violation." *Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (per curiam)). Wexford is therefore also entitled to summary judgment.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment, dkt. [39], is **granted**. Final judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 12/23/2020

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMES WILLEY
864723
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All Electronically Registered Counsel